NORGUET v. PARAMOUNT WORSTED MILLS.

(Circuit Court, D. Rhode Island. March 19, 1910.)

No. 2,864.

1. EVIDENCE (§ 598*)—WEIGHT AND SUFFICIENCY—RIGHT OF JURY TO DISRE-
GARD TESTIMONY.
The rule that to warrant the recovery of damages the plaintiff must support his demand by a preponderance of evidence is as binding upon a jury as upon the judge, and their right to weigh the evidence and to determine disputed questions of fact does not entitle them to reject the positive and direct testimony of disinterested and unimpeached witnesses for the defendant without sufficient reason.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 2450; Dec. Dig. § 598.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

2. EVIDENCE (§ 77*)—PRESUMPTIONS—FAILURE TO CALL WITNESSES.

The nonproduction of witnesses when witnesses are procurable creates a presumption that their testimony, if procured, would be unfavorable.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 97; Dec. Dig. § 77.*]

3. MASTER AND SERVANT (§ 276*)—INJURY TO SERVANT—ACTION—SUFFICIENCY OF EVIDENCE.

Plaintiff alleged that, when working as a weaver in defendant's mill in a room with 10 other weavers, he was on two occasions struck on the right side by a shuttle which flew from a defective loom, and injured; that on the second occasion he was knocked to the floor, where he lay unconscious. His testimony was not corroborated by any other person in the room at the time as to either occasion, but as to the second was directly contradicted by three unimpeached witnesses, two of whom were not in the employ of defendant at the time of the trial. There was also other evidence tending to show that on the second occasion he could not have been struck as he claimed. *Held*, that such evidence was not sufficient to support a verdict in his favor.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 951, 959, 970; Dec. Dig. § 276.*]

At Law. Action by Napoleon Norguet against Paramount Worsted Mills. On motion by defendant for new trial. Motion granted.

A. B. Crafts, for plaintiff.
Vincent, Boss & Barnefield, for defendant.

BROWN, District Judge. The plaintiff, Norguet, claimed that while working for the defendant as a weaver he was on two different occasions struck on the right side and at nearly the same place by a flying shuttle, first on February 19, 1907, and afterwards on May 31, 1907.

The declaration alleged that on each occasion the shuttle flew from the loom in consequence of some defect in the loom, although no specific defect was set forth. The only evidence of a defect in either loom was the testimony of the plaintiff that on each occasion a loom fixer was called to the loom by a weaver, and had been engaged in fixing the loom immediately before the shuttle jumped.

The plaintiff testified that on February 19th the loom fixer also fixed the loom after the shuttle had struck the plaintiff.

On each occasion the loom fixer is said to have worked at the boxes of the loom on the right-hand side.

There was testimony to the effect that there are many causes for the jumping of a shuttle other than defects in the loom; such as tangled threads, knots, or a broken thread. The plaintiff, of course, assumed the risk of the jumping of the shuttle from such causes due to the negligence of his fellow servants.

Upon its petition for a new trial the defendant contends that the evidence was wholly insufficient to show a defect in either loom, and also contends that the plaintiff's testimony that he was struck by a shuttle on either occasion is wholly uncorroborated and untrue in fact.

On February 19th, the plaintiff testifies, he was engaged in running two looms, Nos. 9 and 10, and that between half past 8 and 9 o'clock in the morning, Tuesday, a shuttle flew from loom No. 20 just after

a loom fixer had left it; that he was struck in the right side; and that after the shuttle flew the loom fixer returned to loom No. 20 and fixed it again. The plaintiff testifies that, although he suffered from the blow, he stayed at work until night, and that he continued to work each day until 11 o'clock on Saturday; that the mill closed at 11:30; and that he went to his home, sent for a doctor, and remained two weeks in bed.

The sole corroboration of the plaintiff's story is the testimony of the plaintiff's wife and of Dr. Gervais, who was called on Saturday, February 23d, and says he found marks on the plaintiff's body, a black and blue spot about 2½ inches in diameter, and "a little hole in him" below the fourth rib.

It is to be noted that the plaintiff, who had worked in defendant's mill upwards of two years before the accident, did not produce a single witness in corroboration of his story. The defendant produced the records of the weaveroom, which showed that the plaintiff was credited with no cloth woven on looms Nos. 9 and 10, at which he says he was working at the time of the accident, but shows that cloth was credited to him from looms Nos. 13 and 14, as follows:

February 18th, Loom 14, 57¾ yds.
    "     19th,   "   13, 59½   "
    "     20th,   "   14, 59¾   "
    "     23rd,   "   13, 61½   "
    "     23rd,   "   14, 59½   "

A cut of about 60 yards of cloth is woven upon one loom in about two days.

The record does not show directly the actual amount woven on any particular day, but only the amount of cloth taken off the loom and credited to the weaver each day.

According to the record, the plaintiff during the previous week had worked on looms 13 and 14. The record also shows that plaintiff resumed work March 4th and 5th, when he worked on looms 5 and 6, and that after March 6th he worked on looms 13 and 14.

The plaintiff in rebuttal did not deny the accuracy of defendant's record, but testified that on February 19th he was weaving samples. There was evidence to show that the record produced did not contain an account of work that was paid for by the hour, and the defendant produced no testimony to show that the plaintiff was not credited for work done by the hour. As the record does not show at what time of day the cloth was taken off the looms, the defendant has not excluded the possibility that Norguet might have been working for some hours on looms 9 and 10.

The loom fixer denies that he had any knowledge of the occurrence testified to by Norguet, or that Norguet was struck by a shuttle at any time.

Norguet testified that his first accident was not as severe as the second.

As to the second accident the plaintiff testifies that it occurred May 31, 1907, Friday, on which date he finally left defendant's employment. He states that he was working in the same room, but on looms 13 and 14, and had the same boss and the same loom fixer as on February

19th; that his loom would not work; and that he called the loom fixer, who fixed the loom three times and informed him that it was all right. He states that the loom fixer started the loom, and "as soon as he started the shuttle flew out and hit me on the side, and I flew on the floor." Plaintiff says that he lost consciousness, that while he was on the floor and between the looms the boss gave him water, that he was struck on the right side "two inches from the first time," and that the shuttle came from loom 14 while he was working at loom 13.

Q. And the loom fixer was working on which loom?
A. At No. 14, at the right-hand side.

As the only evidence of a defective condition of the loom was the evidence that the loom fixer was required to fix it, there is nothing to show any defect except at the box on the right-hand side of loom 14. A shuttle flying because of a defect in the right-hand box must have gone towards the plaintiff's left side, and could not in its direct flight have struck him on the right side, since he was facing loom 13, as he testifies, and as was specifically found by the jury. That on this day a shuttle did fly from the right-hand side of loom 14 is established by the testimony of the loom fixer, Prendergast, not at the time of the trial in the defendant's employment, who says that he was called by the plaintiff to the loom, and that in trying the loom a shuttle flew out from the right-hand side and struck the handles of loom 14 on the left-hand side and dropped to the floor; that when the shuttle dropped Norguet kicked it into the middle of the shop and went off. He testified that the shuttle did not bound, but dropped on the floor; that it did not hit Norguet, but came about two feet from him. Upon cross-examination he was asked:

XQ. Will you swear that it did not hit him?
A. No, I wouldn't swear it did not hit him.

He testified that there were 10 weavers at work in the room. He also testified that after Norguet left he looked the loom all over and found no defect in it, but that he found the listing broken, and stated that the condition of the threads was the cause of throwing the shuttle out. He states that Norguet did not then say to him that the shuttle had hit him, that he made no repairs on the loom, and that the loom was afterwards operated.

Keenan, a weaver not now in defendant's employment, corroborates Prendergast, and says that he saw the shuttle come out, go across, hit the handles on the opposite side, and drop to the floor. He was asked:

Q. Did the shuttle hit Norguet at that time?
A. Not as I see it.

There was testimony that on the day of this occurrence, and shortly after the shuttle flew, Norguet claimed that he had been struck by a shuttle. In view of the jury's special finding that on May 31st the plaintiff was facing loom 13 and was struck on the right side by a shuttle flying from loom 14, and in view of the fact that the testimony that the loom fixer fixed loom 14 at the right-hand end was the only testimony of any defective condition in that loom, it seems to follow necessarily that the plaintiff could not have received a blow on his

right side from a direct flight of the shuttle due to any proven defect in defendant's machinery. The only possibility that he was struck as he says he was was from a rebound of the shuttle, and that there was a rebound is directly contradicted.

It seems impossible that the plaintiff could have been knocked to the floor and have lain on the floor unconscious without attracting the attention of a single one of his fellow operatives in the same room. In considering the question whether the verdict is against the evidence we cannot disregard the fact that the plaintiff has not produced as to either occurrence a single one of his fellow workmen to corroborate his testimony. On the other hand, as to the accident of February 19th, he is contradicted by the loom fixer and by the record of the weaveroom, though this, it must be conceded, does not preclude the possibility of the occurrence. As to the accident of May 31st he is directly contradicted by the loom fixer and a fellow workman, as well as by the boss, who denies the incident as to giving him water while he was on the floor.

Dr. Gervais also testified to finding marks of a second accident on the plaintiff's body. He was asked:

Q. Now, when you were called May 31st, did you see any marks on his body?
A. I did.
Q. What was that?
A. Another accident same as the first one. On the Thursday I happened to call there. There was no ecchymosis, that is, a kind of blue mark, when I was called; but this came later on a couple of days, and gave just about the same result, a couple of inches in diameter of a blue mark.
Q. Were these marks that you saw there on February 23d and May 31st in the same place?
A. A couple of inches difference.
Q. You saw a puncture of the skin, or a bruise?
A. Bruise.
Q. No puncture of the skin?
A. Not exactly, no.

There was evidence from Dr. Gervais and the plaintiff's wife as to illness following both the first and second accidents. There was evidence from the defendant tending to show that prior to either accident the plaintiff was ill. On cross-examination the plaintiff was asked whether he was not sick before February 19, 1907, and replied, "No."

XQ. Didn't you wear a silk bandage on your stomach in that mill on February 19, 1907?
A. No.
XQ. Have you ever worn a silk bandage?
A. No.
XQ. Have you ever worn a bandage on your stomach of any kind?
A. No.

Keenan testified to seeing him wear a blue serge bandage; that he had it when he came to work in the mill and wore it round his body.

Trainor testified that he wore a bandage in 1906, and there was further evidence tending to show impairment of plaintiff's physical condition for some reason other than either accident.

On redirect plaintiff was asked:

Q. Did you ever wear a bandage after the first accident?
A. After the first accident, yes.
Q. Did you ever wear it before?
A. No.

The general rule that a court is forbidden from condemning any one in damages except in behalf of a party who supports his demand by a preponderance of evidence was stated by the Circuit Court of Appeals for this circuit in The Charles L. Jeffrey, 55 Fed. 685, 5 C. C. A. 246. See, also, 17 Cyc. 754 et seq. This rule is as binding upon a jury as upon the judge: and the right of a jury to weigh the evidence and to determine disputed questions of fact does not relieve them of the duty of following the instruction of the court that they must decide disputed questions of fact according to the preponderance of proof. They cannot reject the positive and direct testimony of disinterested and unimpeached witnesses for the defendant without sufficient reason. It is the well-settled rule of law that the plaintiff must not only offer proof of negligence, but that he is under the obligation of supporting his case by a preponderance of proof.

To permit a plaintiff to sustain a case of this character upon his own bare and uncorroborated statements, without the support of eyewitnesses, when the occurrence, if true, would in all probability have attracted the attention of his fellow workmen, and when there was opportunity, if machinery was defective, to have had an examination made and discover and point out the defect, is dangerous.

The nonproduction of witnesses, when witnesses are procurable, creates a presumption that their testimony, if procured, would be unfavorable. Graves v. U. S., 150 U. S. 118, 14 Sup. Ct. 40, 37 L. Ed. 1021; Runkle v. Burnham, 153 U. S. 216–225, 14 Sup. Ct. 837, 38 L. Ed. 694; Clifton v. U. S., 4 How. 242, 11 L. Ed. 957.

It seems highly improbable that, if the plaintiff on May 31st received so violent a blow as to knock him to the floor and render him unconscious, he should not be able to find a single witness to the fact. It is contrary to the usual experience in these cases that there should be in a weaveroom an accident of this character and severity that was seen by no one. When the plaintiff's story, under such circumstances, is not only not corroborated, but is definitely contradicted by three well-appearing and unimpeached witnesses, it becomes especially necessary for the court to apply the rule of law that requires of the plaintiff the preponderance of proof.

I am of the opinion that the plaintiff has not produced a preponderance of proof as to the occurrence of either accident, or as to a defect in the defendant's machinery on either occasion.

When a case of this character is meritorious, it is the usual practice of attorneys to support the plaintiff's story by the testimony of corroborating witnesses and to give to the jury the benefit of the testimony of some at least of those persons who were present. Such corroboration is especially necessary where the case presented is of an unusual and extraordinary character, as when the plaintiff seeks to hold the defendant liable for the joint effect of duplicate accidents, of the same character, producing injuries at practically the same place on the plaintiff's body, and both due to similar defects in the defend-

ant's machinery, that are proved, not directly, but only indirectly, by similar proof that before each accident the looms were fixed by a loom fixer.

The production of decisions of various courts as to the minimum of proof upon which a plaintiff may be allowed to maintain a case is of much less assistance in the just settlement of the rights of the parties than the production of witnesses who will furnish evidence from which the true state of facts may be determined. The trial of cases in the ordinary way, by producing a fair amount of direct and corroborating testimony, will in a meritorious case obviate the unfavorable presumption that may arise from the production of a mere minimum of proof.

While there are many decisions to the effect that a plaintiff is excused from proof of specific defects in machinery when such proof is not procurable, such cases do not relieve a plaintiff from the duty of producing such proofs as are procurable by reasonable diligence and inquiry, or from the duty of establishing by a preponderance of proof the fact that the defendant was negligent. Especially is it true that such cases have no application to relieve a plaintiff of the burden of proving by a preponderance of evidence the actual occurrence of the event from which he alleges he received injuries.

Upon a consideration of the entire testimony in the case, and of the briefs and supplemental briefs of counsel, I am of the opinion that the verdict fails to administer substantial justice to the parties upon the proofs presented. See Wilcox v. Rhode Island Co., 29 R. I. 292–296, 70 Atl. 913. I was of that opinion at the trial, and that opinion has been confirmed by a review of all the testimony.

Defendant's petition for a new trial granted.